**O.L. McLENDON, et al., Plaintiffs,**

v.

**GEORGIA KAOLIN CO., INC., Defendant.**

**Civ. A. No. 85–338–2–MAC (WDO).**

United States District Court, M.D. Georgia, Macon Division.

Jan. 10, 1992.

Hugh C. Wood, Wood & Meredith, Decatur, Ga., for plaintiffs.

John B. Harris, Jr., William C. Harris, Harris & Harris, Macon, Ga., for defendant.

## ORDER

OWENS, Chief Judge.

This case concerns a series of conveyances of interests in a tract of land in Wilkinson County, Georgia, from the heirs of Edward D. Smith (most of whom are represented by plaintiffs in this action) to defendant, Georgia Kaolin Company, Inc. These conveyances took place in 1969 and 1971.

Plaintiffs filed this lawsuit in the Superior Court of Bibb County in 1985 shortly after learning that the property which they conveyed to defendant allegedly contains a large kaolin deposit.[1] In their complaint, plaintiffs allege that defendant purchased their interests in the property through fraudulent misrepresentations and concealment. Plaintiffs also claim that defendant has engaged in price-fixing of kaolin and conspiracy.

Defendant removed the case to federal court and has now filed a motion for summary judgment claiming that plaintiffs are unable to establish a prima facie case of either fraud, price-fixing, or conspiracy and that plaintiffs' claims are barred by the statute of limitations. Plaintiffs have submitted affidavits and other documents in opposition to defendant's motion.

## THE PLAINTIFFS

In 1916, Edward D. Smith died intestate, leaving a 325–acre tract in Wilkinson County, Georgia ("Smith property"), to his heirs-at-law.[2] In 1965, the following people were the holders of undivided interests in the Smith property:

| Holder (relation to Edward D. Smith) | Interest |
|---|---|
| Juanita Smith McLendon (daughter) | 1/10 |
| Tommy Smith (son) | 1/10 |
| Grant Smith (son) | 1/10 |
| Pearl Smith Hines (daughter) | 1/10 |
| Mamie Hollingsworth (daughter) | 1/10 |
| James H. Hill (grandson) | 1/10 |
| Evie Barksdale Solomon (son's sister-in-law) | 1/10 |
| Bessie Cornelia Tift (granddaughter) | 1/40 |
| Bernice Tift Newton (granddaughter) | 1/40 |
| W.C. Day (grandson) | 1/40 |
| James E. Day (great-grandson) | 1/160 |
| Jerry Day (great-grandson) | 1/160 |
| Willie L. Day (great-grandson) | 1/160 |

1. Kaolin is a valuable clay primarily used for coating paper.

2. In 1916, Edward D. Smith's heirs-at-law were his wife, Ellen Smith, and his ten children: Tommy E. Smith, Cornelia Smith Tift Day [*], Mary Eliza Smith Banner [*], Pearl Smith Hines [*], Sidney J. Smith, Juanita Smith McLendon [*], Mamie Smith Thorpe Hollingsworth [*], Grant Smith, Virginia Smith Hill [*], and Charlie Smith.

[*] The Smith daughters are referred to here by their married names to maintain consistency throughout this opinion.

| Holder (relation to Edward D. Smith) | Interest |
|---|---|
| Tommy Day (great-grandson) | 1/160 |
| Lula S. Courtney (granddaughter) | 1/60 |
| Charles A. Smith (grandson) | 1/60 |
| Robert Lee Smith (grandson) | 1/60 |
| Sidney J. Smith, Jr. (grandson) | 1/60 |
| Viola S. Griffin (granddaughter) | 1/60 |
| Lillie Belle Teal (granddaughter) | 1/60 |
| Edward Banner (grandson) | 1/20 |
| Louella Banner Shavers (granddaughter) | 1/20 |

These holders, except Edward Banner, Louella Banner Shavers, Sidney Smith, Jr., and Evie Barksdale Solomon,[3] are represented by the plaintiffs in this action.

The plaintiffs can be divided into four groups. The first group consists of the holders of interests in the Smith property who are still living and who sold their interests in the property to defendant in 1969. Pearl Smith Hines, Lula Courtney, Viola Smith Griffin, Jerry Day, Tommy Day, Bernice Tift Newton, Charles S. Smith, Robert Lee Smith, Bessie Cornelia Hughes, Willie L. Day, and James E. Day are the members of this group.

The second group consists of the personal representatives of the estates of the holders of interests in the Smith property, other than Tommy Smith, who sold their interests to defendant in 1969 and are now deceased. O.L. McLendon represents the estate of his wife, Juanita McLendon; Archie Anderson represents the estate of his grandmother, Mamie Hollingsworth; Molly Mae Hill represents the estate of her husband, James H. Hill; Mary E. Day represents the estate of her husband, W.C. Day; and Carl Senior represents the estate of his mother, Lillie Belle Teal.

The third group consists of the estate of Tommy Smith. Tommy Smith must be put in a separate category because of his unique relationship to the transactions at issue. His estate is represented by his niece, Dorothy Ann Cooper.

The last group consists of Grant Smith, who was adjudicated incompetent in 1924. His interest was conveyed to defendant in 1971 through circumstances separate from those involving the conveyances of the interests of the other holders. Hence, the court will address his claim in a separate order to avoid confusion.

When the Smith holders conveyed their interests to defendant in 1969, most of them had received little education. In addition, Tommy Smith was the only holder who was actually living on the Smith property during all of the events of concern in this case. Most of the other Smith holders were living outside the state of Georgia.[4]

### THE DEFENDANT

Defendant Georgia Kaolin Company, Inc. ("GKC") is one of seven kaolin companies which operate in the state of Georgia. It is a New Jersey corporation. During the time period when the transactions at issue took place, defendant was known as Yara Engineering Corporation ("Yara"). Defendant's name was changed to Georgia Kaolin Company, Inc. in 1981.

Another entity that plays a role in this case is Georgia Kaolin Company ("GKC2"), a subsidiary of defendant. GKC2, a New Jersey corporation, was defendant's operating company until it was liquidated into defendant in 1976.

**3.** Edward Banner and Louella Banner Shavers are deceased. Sidney Smith, Jr. never sold his interest to defendant because he was never located during the time in which the conveyances took place. Evie Barksdale Solomon sold her interest to Tommy Smith in July of 1968.

**4.** Aside from Tommy Smith, only Mamie Hollingsworth (1/10) and James H. Hill (1/10) lived in the state of Georgia.

## FACTS

■ In ruling on a motion for summary judgment, the court must resolve all doubts, draw all inferences, and view all disputed facts in favor of the party opposing the motion. *United States v. An Article of Food Consisting of 345/50–Pound Bags*, 622 F.2d 768, 771 (5th Cir.1980); *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985).

■ However, a party opposing the motion may only rely on competent and admissible evidence to defeat the motion. *E.g., Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324 (9th Cir.1980). Hence, the following facts are those which are undisputed, and where there is a dispute, plaintiffs' version is adopted. However, the facts do not include that which could only be established through inadmissible or incompetent evidence.

### The 1969 Conveyances

In the mid 1960's, Tommy Smith and Juanita McLendon proposed to the other Smith heirs [5] that they sell the Smith property. The Smith heirs agreed to sell, and Tommy Smith, as the only heir who lived on the property and the one most familiar with its value, was made responsible for the negotiations and management of a possible sale of the property. Plaintiffs' Exhibits A1–A15.[6] The other heirs trusted and relied on Tommy Smith's judgment because he was a close relative and, while most of the Smith heirs lived outside of Georgia, Tommy Smith lived on the property and farmed it as his own. *Id.*

In August of 1965, Tommy Smith hired an attorney, Fred M. Hasty, to represent the Smith heirs in the sale. Stipulation of March 16, 1990. Hasty contacted A.G. Bowman, head of defendant's land department, on September 21, 1965, to see if defendant were interested in purchasing the property. *Id.*

Defendant already had a lease interest in the mineral rights of the Smith property through its subsidiary Georgia Kaolin Company ("GKC2"). Tommy Smith had executed this lease to GKC2 on May 10, 1948. Plaintiffs' Exhibit E.[7] The lease named Tommy Smith as lessor, but it gave no indication that there were other owners of the property or that Tommy Smith held only a partial interest in the property.[8]

---

5. The term "Smith heirs" refers to the heirs of Edward D. Smith who both held an interest in the Smith property in the mid 1960's and sold that interest in 1969. The term excludes Grant Smith, Sidney J. Smith, Jr., and Evie Barksdale Solomon.

6. Plaintiff's Exhibits A1–A15 are affidavits by most of the Smith heirs or their estate representatives.

A1 Pearl Hines
A2 Lula Courtney
A3 Viola Smith Griffin
A4 O.L. McLendon, representative of the estate of Juanita McLendon
A5 Archie Anderson, representative of the estate of Mamie Hollingsworth
A6 Dorothy Ann Cooper, representative of the estate of Tommy Smith and guardian of Grant Smith
A7 Jerry Day
A8 Mary E. Day, representative of the estate of W.C. Day
A9 Thomas L. Day
A10 Molly Mae Hill, representative of the estate of James H. Hill
A11 Bernice Tift Newton
A12 Carl Senior, representative of the estate of Lillie Belle Teal
A13 Charles A. Smith
A14 Robert Lee Smith
A15 Bessie Cornelia Tift Hughes

Plaintiffs Willie L. Day and James E. Day did not submit affidavits.

7. The lease was to be effective for twenty-five years, unless terminated by GKC2, and GKC2 had the option to extend the lease for an additional twenty-five years. The lease gave GKC2 the right to "drill, prospect for, mine and remove all the kaolin" and other minerals found on the property in exchange for an initial consideration of $162.50, a yearly payment of $325, and royalty payments when mined. Plaintiffs' Exhibit E.

8. The court notes that apparently when Tommy Smith executed the 1948 lease, he thought that he had the authority to sign for some of the other Smith heirs. Tommy Smith's mother and five of his siblings executed a limited power of attorney to Tommy Smith on November 25, 1939. Plaintiffs' Exhibit I. This instrument gave Tommy Smith the power to sell timber from the property, to sign rent waivers in order to borrow money to farm the property, and "to do and perform all and every act and acts, thing and things, device and devices, in the law whatsoever needful and necessary to be done in and

GKC2 did not check the title on the Smith property until several years later.

GKC2 drilled on the Smith property in 1949 under the lease and allegedly determined that there was a valuable kaolin deposit there, but never removed any kaolin or other minerals from the property.[9] The other Smith heirs were neither aware of the lease nor that GKC2 had drilled on the property. Plaintiffs' Exhibits A1–A15. GKC2 and defendant did not learn that the 1948 lease was only valid for a partial interest in the property until sometime after the negotiations with Hasty began in 1965.[10]

Hasty's negotiations with defendant for the sale of the Smith property were ultimately unsuccessful. Stipulation of March 16, 1990.[11] Tommy Smith discharged Hasty's services in the summer of 1966. *Id.*

A.G. Bowman and Tommy Smith continued their negotiations for the sale of the Smith property after Hasty's services were discharged. Plaintiffs' Exhibit B.[12] According to a letter from Bowman to defendant's president, dated February 21, 1967, the following terms were reached:

I have been negotiating with Tommy Smith the possible purchase of [the Smith property] along the following lines. Tommy Smith would be paid $1000 when all of the heirs have signed the Option to Purchase. The other heirs would be paid $25.00 each as consideration. The option is to be for twelve months and provide a purchase at $85,000 [or $260 per acre]. Tommy Smith wants to have the use of the house and a small acreage of farm land around same for his lifetime or eight years, whichever comes sooner.

.... It is going to take quite a bit of time and effort by Tommy Smith to get this option signed. That is the reason for the payment of $1000 to him.

. . . .

I plan to make a separate option to purchase for each of the heirs in the name of Alex Boone, Jr. so that, at your election, we can purchase a part interest if we do not get all of the heirs to sign the original Options to Purchase.

Plaintiffs' Exhibit B.[13]

Sometime in early 1967, defendant retained Alex S. Boone, Jr. as its attorney to help in the purchase of the Smith property. Alex Boone had previously represented Tommy Smith's wife, Agnes Smith, in some

---

about the premises." *Id.* However, the instrument did not give Tommy Smith any power to sell or to lease the interests of those who signed it. *Id.*

9. The parties are in dispute as to what GKC2 learned about the kaolin on the property from the 1949 drilling. However, a letter dated February 21, 1967, from A.G. Bowman, head of defendant's land department, to defendant's president states, "There is no doubt in my mind that this property contains a large tonnage of clay similar to [clay already being investigated on an adjacent property]." Plaintiffs' Exhibit B.

10. The correspondence between A.G. Bowman and Fred M. Hasty indicates that Bowman was unaware that defendant's lease on the Smith property covered only a partial interest when Hasty first contacted Bowman in 1965. Stipulation of March 16, 1990. In addition, a letter from Bowman to Edward Grassman dated February 21, 1967 states that defendant "recently" discovered that its lease only covered a 1/10 interest. Plaintiffs' Exhibit B.

11. On May 2, 1966, Hasty wrote to A.G. Bowman that "the heirs are willing to accept $600 per acre [or $195,000] for the land", but defendant did not accept this offer.

12. Plaintiffs have alleged that Bowman told Tommy Smith and some of the Smith heirs that the property was not worth very much because GKC2 held a lease on the property which could run for fifty years. However, there is no competent evidence to establish this contention. *See infra.*

13. There is further documentary evidence of Tommy Smith's relationship with defendant during the sale of the property:

1. A June 4, 1968 letter from A.G. Bowman to Alex Boone states, "Please furnish me with Xerox copies of the Options to Purchase that Tommy Smith has acquired." Plaintiffs' Exhibit F.

2. A July 29, 1970 memo to defendant's file from A.G. Bowman states, "As the result of [Tommy Smith's help in the purchase of the Smith property], we gave Tommy Smith the right to use the house that he now occupies for his lifetime or for a period of 8 years, whichever ended first."

unrelated matters,[14] and the other Smith heirs knew of this representation.

In addition, Tommy Smith told some of the other Smith heirs that Alex Boone was his attorney.[15] Plaintiffs' Exhibits A1–A15. Tommy Smith did not disclose to the other heirs that Alex Boone was the attorney for defendant. *Id.* Based on the knowledge that Boone had represented Tommy Smith and his family on prior occasions and on Tommy Smith's statements to them that Boone was his attorney, the other heirs believed that Alex Boone was Tommy Smith's attorney in relation to the sale of the Smith property. *Id.*

Alex Boone drew up the option contracts as requested by defendant, and these options named Alex Boone as the "Purchaser." The options did not mention defendant at all. Each option provided that the "Purchaser" had one year to exercise the option and that the "Purchaser" had "the right to enter upon the said lands to drill, dig test pits, remove samples and do all other things necessary and incidental to the thorough prospecting of said lands for the purpose of determining the quantity and quality of kaolin and all other minerals in, on or upon said lands." The options were transferrable and assignable by either party.

Tommy Smith notified the other heirs that Alex Boone was sending them papers to sign. Plaintiffs' Exhibits A1–A15. He advised them to sign the options and then to return the documents to Alex Boone. *Id.* The heirs did not know that Alex Boone, the named purchaser, had signed the option contracts as an agent for defendant. *Id.* Moreover, Tommy Smith never revealed that defendant was paying him to get the options signed. *Id.* Sixteen of the Smith heirs signed the options to Alex Boone between April 24, 1968 and June 7, 1968.[16]

Between July 8, 1968 and September 30, 1968, defendant entered the Smith property and drilled over 100 holes on the property. Plaintiffs' Exhibit D.[17] Defendant did not believe that this drilling would interfere with getting the remainder of the options signed, for in a memorandum from A.G. Bowman to one of defendant's other officers, dated June 4, 1968, Bowman stated:

I do not think drilling will affect the chances of obtaining the other Options to Purchase. As you know this property is owned by a large number of negroe [sic]

---

**14.** In 1964, Agnes Smith, wife of Tommy Smith, hired Alex S. Boone, Jr. to represent her in connection with her appointment as receiver for an estate which contained property adjacent to the Smith property. Agnes Smith executed a mineral lease on this property on July 9, 1964. The rate under this lease was 15 cents per ton of finished product of kaolin clay. Plaintiffs' Exhibit N. In addition, Boone had represented Agnes Smith when she was appointed guardian of her niece, Dorothy Ann Cooper in 1961. Affidavit of Dorothy Ann Cooper (Plaintiffs' Exhibit A6).

**15.** It is unclear why Tommy Smith made this statement to some of the heirs. Unfortunately, since Tommy Smith is dead, there is no way to determine the answer.

**16.**

| | | |
|---|---|---|
| Tommy Day | 4/24/68 | 1/60 |
| Viola S. Griffin | 4/24/68 | 1/60 |
| W.C. Day | 4/24/68 | 1/40 |
| Lula S. Courtney | 5/05/68 | 1/60 |
| Bessie Cornelia Hughes | 5/09/68 | 1/40 |
| Bernice Tift Newton | 5/31/68 | 1/40 |
| Willie L. Day | 5/31/68 | 1/160 |
| James H. Hill | 5/31/68 | 1/10 |
| Charles A. Smith | 5/31/68 | 1/60 |
| Lillie Belle S. Teal | 5/31/68 | 1/60 |
| Robert L. Smith | 5/31/68 | 1/60 |
| Pearl S. Hines | 5/31/68 | 1/10 |
| Juanita S. McLendon | 5/31/68 | 1/10 |
| Mamie S. Hollingsworth | 5/31/68 | 1/10 |
| Edward Banner | 6/07/68 | 1/20 |
| Louella Banner Shavers | 6/07/68 | 1/20 |

**17.** The parties are in dispute as to what defendant discovered from these drill samples.

heirs living in widely separated places throughout the United States.

Plaintiffs' Exhibit P. All of the Smith heirs (except Tommy Smith) were unaware of this drilling. Plaintiffs' Exhibits A1–A15.

Defendant did not reveal any information that it obtained from the drilling to the Smith heirs. *Id.* Moreover, it is defendant's policy not to reveal such information to prospective purchasers. None of the heirs were aware that there was kaolin on the property. Plaintiffs' Exhibits A1–A15. They assumed that the land was being sold as farm land. *Id.*

On July 28, 1968, Tommy Smith purchased a 1/10 interest in the Smith property from his brother's sister-in-law, Evie Barksdale Solomon, who resided in Michigan. He purchased this interest for $500 and, consequently, had a 1/5 interest in the Smith property. Alex Boone allegedly handled this transaction for Tommy Smith.[18] After this transaction, the remaining Smith heirs (except Grant Smith and Sidney J. Smith, Jr.) signed options to Alex Boone.[19]

Prior to the expiration of each option, Alex Boone notified each heir by letter that he wished to exercise the options. He drafted deeds that conveyed each heir's interest to defendant. Yara Engineering Corporation was the named purchaser on each deed. Boone sent to each heir a deed accompanied by a letter that contained instructions on the proper procedure to execute the deed. The letters did not reveal that Boone was the attorney for defendant. Moreover, Tommy Smith never revealed to the other Smith heirs that Boone was defendant's retained attorney.

The Smith heirs signed the deeds between April 24, 1969 and October 21, 1969.[20] When they signed the deeds, they did not know that defendant (then called Yara Engineering Corporation) was a kaolin company, but thought it was an engineering company. Plaintiffs' Exhibits A1–A15. Defendant paid each heir his proportionate share of the $85,000 purchase price accordingly.

From 1969 Until the Filing of This Lawsuit

After the Smith heirs conveyed their interests in the Smith property to defendant in 1969, Tommy Smith remained on the property as defendant and he had agreed. It is unclear how long Tommy Smith remained on the property; however, some of the Smith heirs were aware that he had remained on the property after the sale. In addition, defendant paid Tommy Smith according to their agreement in exchange for Tommy Smith's help in acquiring the options.

Defendant acquired Grant Smith's interest in 1971. Since Grant Smith was an incompetent, his interest had to be conveyed by court order on petition of his guardian. Alex Boone represented Tommy

---

**18.** The only competent evidence that Boone represented Tommy Smith in this transaction is that an unexecuted onion skin copy of the deed conveying Ms. Solomon's interest to Tommy Smith is in Alex Boone's files. Plaintiffs' Exhibit K. When this fact is considered in light of the surrounding circumstances of this case, a reasonable jury could find that Alex Boone did represent Tommy Smith during this transaction.

**19.**

| Tommy Smith | 8/29/68 | 2/10 |
| James E. Day | 9/17/68 | 1/160 |
| Jerry Day | 10/21/68 | 1/160 |

**20.** The deeds were conveyed as follows:

| Tommy Smith | 4/24/69 |
| Viola S. Griffin | 4/24/69 |
| W.C. Day | 4/24/69 |
| Bernice Tift Newton | 5/5/69 |
| Willie L. Day | 5/5/69 |
| James H. Hill | 5/5/69 |
| Charles A. Smith | 5/5/69 |
| Lillie Belle Teal | 5/5/69 |
| Lula S. Courtney | 5/5/69 |
| Robert L. Smith | 5/5/69 |
| Pearl S. Hines | 5/5/69 |
| Juanita S. McLendon | 5/5/69 |
| Bessie Tift Hughes | 5/9/69 |
| Mamie S. Hollingsworth | 5/31/69 |
| Edward Banner | 6/7/69 |
| Louella Banner Shavers | 6/7/69 |
| Tommy Smith | 8/29/69 |
| James E. Day | 9/17/69 |
| Jerry Day | 10/21/69 |

Smith during the proceeding in which Tommy Smith was appointed Grant Smith's guardian and during the proceeding in which Tommy Smith petitioned for a court order to convey Grant Smith's interest to defendant. Alex Boone was representing defendant during this proceeding as well. This transaction will be discussed in detail in a later order of this court.

Defendant has conducted no drilling on the property and has removed no minerals from the property since the 1969 conveyances. Defendant is holding the property as a reserve kaolin deposit. However, there are some open kaolin mines on properties adjacent to the Smith property that have been in operation since the time of the 1969 conveyances.

Plaintiffs learned that the Smith property contains kaolin shortly before filing this lawsuit in 1985.[21] None of the plaintiffs knew that Tommy Smith had been paid by defendant for his help in acquiring the options until this was revealed during discovery in this lawsuit.

The discovery of kaolin requires much technical expertise and expensive drilling equipment. None of the plaintiffs have the technical expertise to drill for kaolin, and none have ever had access to drilling equipment. Moreover, to hire someone to drill for kaolin is very expensive.

The plaintiffs filed this suit claiming that defendant's purchase of their property was fraudulent in that defendant did not reveal to them that there was a large kaolin deposit on the land. They have also alleged that defendant, through its agents, made some affirmative misrepresentations to them prior to the conveyances. They seek rescission of the deeds or, in the alternative, damages.

Plaintiffs have also claimed that defendant has engaged in price-fixing of kaolin prices. However, on May 18, 1989, plaintiffs stated that they "would like to amend the pleadings to drop [the antitrust claim]" because the case was "a fraud case." Transcript, Status Conference, May 18, 1989, pp. 12 and 13. The court finds that

this statement was adequate to dispense with the antitrust claim and accordingly GRANTS summary judgment to defendant on Count III of plaintiffs' complaint.

Plaintiffs have also alleged that defendant is withholding mining operations on the property as part of a conspiracy to let the property lie idle until all parties with knowledge have died. There is no evidence to support this claim; thus, summary judgment for defendant is GRANTED on Count IV of plaintiffs' complaint.

## DISCUSSION

Because some of the evidence upon which plaintiff relies to defeat defendant's motion was not considered in the above statement of facts, the court first will discuss the evidentiary issues raised by the parties.

■ It is the general rule that only competent and admissible evidence can be used to overcome a motion for summary judgment. *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324 (9th Cir. 1980). In particular, an affidavit may only be considered in ruling on summary judgment if it was made based on personal knowledge, sets forth facts admissible in evidence, and shows affiant to be competent to testify. *CMS Industries Inc. v. L.P.S. International, Ltd.*, 643 F.2d 289 (5th Cir.1981).

■ Plaintiffs have submitted several affidavits to oppose defendant's motion. Some of these affidavits do not meet the above requirements; therefore, they have been disregarded. First, several of the affidavits were not made with personal knowledge. These affidavits were made by the personal representatives of the Smith heirs who actually made the conveyances: O.L. McLendon for Juanita McLendon, Archie Anderson for Mamie Hollingsworth, Dorothy Ann Cooper for Tommy Smith, Mary E. Day for W.C. Day, Molly Mae Hill for James H. Hill, and Carl Senior for Lillie Belle Teal. Where these affidavits state that the deceased "knew" or

21. The record does not indicate how or when plaintiffs learned of the kaolin on the property.

"thought" something,[22] they have been disregarded. These affiants are incompetent to testify to something of which they have no personal knowledge. Fed.R.Evid. 602.

In addition, many of the affiants state that Tommy Smith told them that Alex Boone was his attorney. Plaintiffs' Exhibits A1, A2, A3, A6, A7, A11, A13, A14, A15.[23] This statement cannot be used to prove that Alex Boone *was* Tommy Smith's attorney, for this would be hearsay. Fed. R.Evid. 801, 802. However, this statement can be used for other purposes.

Furthermore, under Rule 601 of the Federal Rules of Evidence, "in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with State law." Thus, the Georgia Dead Man's Statute, § 38–1603, applies to this case to determine the competency of witnesses.[24]

Under the Georgia Dead Man's Statute, § 38–1603(3):

> Where any suit shall be instituted or defended by a corporation, the opposite party shall not be admitted to testify in his own behalf to transactions or communications solely with a deceased or insane officer or agent of the corporation; nor shall an officer or agent of a corporation ... be admitted to testify against an opposite party who is the personal representative of a deceased person, as to transactions or communications with such deceased person.

■ The rule does not apply to documentary evidence. *Glo–Ann Plastic Industries, Inc. v. Peak Textiles, Inc.,* 134 Ga. App. 924, 216 S.E.2d 715 (1975); *Frazier v. Willis,* 128 Ga.App. 762, 197 S.E.2d 831 (1973); *Childers v. Ackerman Construction Co.,* 211 Ga. 350, 86 S.E.2d 227 (1955). Thus, the rule does not affect the letters and other documents written by persons now deceased. However, it does limit that to which affiants are competent to testify regarding statements made by defendant's agents that are now deceased.

The Dead Man's Statute is very strictly construed. *E.g., Christian v. Allstate Insurance Company,* 152 Ga.App. 358, 262 S.E.2d 621 (1979) (while statute, which refers to "agents" in its language, affects the competency of "agents" of a deceased party, the statute does not apply to "subagents"). Thus, only situations that are expressly described in the statute are affected.

■ Defendant allegedly used three agents in its transactions with the Smith heirs: A.G. Bowman, Alex Boone, and Tommy Smith, and all three are now deceased. A.G. Bowman was one of defendant's officers and Alex Boone was defendant's retained attorney; thus, they were "agents" as contemplated by the statute, and as such, no interested witness can testify as to transactions he had with either of them. § 38–1603(3).

Bowman's only "transaction" with any of the Smith heirs other than Tommy Smith was his alleged statement to some of the heirs that the Smith property had little value because defendant held a lease on the mineral rights of the property. Under the Dead Man's Statute, no plaintiff is competent to testify to this statement. In addition, none of the plaintiffs can testify as to

---

**22.** For example, O.L. McLendon states in his affidavit:

> At the time Juanita signed the "Option to Purchase", she thought that Mr. Boone was the lawyer for Tommy Smith and the Smith family. Had she known that Mr. Boone was working for a kaolin company, she would not have sold her property for such a small price....

Plaintiffs' Exhibit A4, para. 12 (emphasis added).

**23.** For example, Lula Courtney states in her affidavit,

> I was told by Tommy Smith that [Alex] Boone had been hired by Tommy Smith to represent Uncle Tom and the other Smith heirs in the sale of the property.

Plaintiffs' Exhibit A2, para. 12.

**24.** This statute was repealed by the Georgia legislature in 1979; however, it still applies to causes of action that arose before 1979. *See Grant v. Bell,* 161 Ga.App. 878, 288 S.E.2d 907 (1982).

oral transactions between Tommy Smith and A.G. Bowman. Bowman's other activities are unaffected.

It appears that Alex Boone never directly communicated with the Smith heirs other than Tommy Smith except by letter. He worked exclusively through Tommy Smith. Thus, none of the plaintiffs can testify concerning oral transactions between Tommy Smith and Alex Boone. Alex Boone's other activities are unaffected by the Dead Man's Statute.[25] However, no plaintiff can testify as to the "non-existence" of transactions between Alex Boone and that plaintiff. *Kennedy v. Butler, Stevens & Co.*, 16 Ga.App. 41, 84 S.E. 499 (1915); *Webb v. Simmons*, 3 Ga.App. 639, 60 S.E. 334 (1908).

■ In contrast to A.G. Bowman and Alex Boone, Tommy Smith's agency to defendant does not fall into the express situations contemplated in the Dead Man's Statute. A jury could find that Tommy Smith was not simply an agent of defendant, but that he was also an agent for the other Smith heirs. The other heirs left all the negotiations and management of the sale to him. They relied on Tommy Smith's judgment and trusted him regarding the sale of the Smith property. This is enough to create an implied agency between Tommy Smith and the other Smith heirs such that Tommy Smith was responsible for obtaining the best deal he could for the sale of the property. *Aetna Ins. Co. v. Glens Falls Ins. Co.*, 453 F.2d 687 (5th Cir.1972); *Bearlund v. Webb*, 127 Ga.App. 555, 194 S.E.2d 328 (1972); *Fordham v. Garrett-Schwartz Motor Co.*, 121 Ga.App. 237, 173 S.E.2d 450 (1970); *Brown v. Brown*, 209 Ga. 620, 75 S.E.2d 13 (1953). Thus, he was an agent for both the buyer and seller, a

naturally conflicting position, and this agency was undisclosed to the other Smith heirs.

The Georgia Supreme Court has ruled that the Dead Man's Statute does not apply to dual agency. *See Whiddon v. Hall*, 155 Ga. 570, 574, 118 S.E. 347 (1923) ("the language [in the Dead Man's Statute] refers to the agent or attorney of one of the parties to a transaction and not to the agents or attorneys of both parties"); *Grant v. Bell*, 161 Ga.App. 878, 288 S.E.2d 907 (1982); *Christopher v. Mooty*, 158 Ga. 315, 123 S.E. 19 (1924).[26] Thus, transactions between Tommy Smith and the other Smith heirs are not covered by the Dead Man's Statute. Plaintiffs are competent to testify as to statements which Tommy Smith made to them even when, at the time, he was acting as an agent for defendant.

## I. THE FRAUD CLAIMS

In their complaint, plaintiffs allege both affirmative misrepresentations and fraudulent concealment by defendant. The court will discuss each of these claims in turn.

■ To establish a prima facie case of fraud, plaintiffs must prove the following elements:

1) That defendant made a false representation of a material fact or concealed a material fact when under a duty to disclose;

2) That defendant knew the representation to be false or omission to be true when he made it;

3) That defendant made the representation or omission with the intent and purpose of deceiving plaintiff;

---

**25.** While plaintiffs claim that Alex Boone also represented the Smith heirs, there is no admissible evidence to establish this, *see infra;* thus, Alex Boone was simply an agent of defendant, and no plaintiff is competent to testify as to any statements which he made to them.

**26.** The court notes that these cases involve a situation where one or both principals are deceased and the dual agent wants to testify against one of the deceased principals as to a transaction between the dual agent and the de-

ceased principal. The court held in each case that the Dead Man's Statute did not apply in this situation.

The situation in the case at bar is different; both principals are living while the dual agent is deceased, and one principal wants to testify as to transactions it had with the dual agent. However, this distinction is not important because to apply the Dead Man's Statute in one dual agency situation and not to apply it to another would create an inconsistency.

4) That plaintiff relied on the representation or omission;

5) That plaintiff suffered an injury as a result of such reliance.

*Hubbard v. Stewart,* 651 F.Supp. 294 (M.D.Ga.1987); *McLendon v. Galloway,* 216 Ga. 261, 116 S.E.2d 208 (1960). These requirements apply to both affirmative misrepresentation and fraudulent concealment.

### A. *Affirmative Misrepresentation*

Plaintiffs have alleged that defendant, through its agents, made affirmative misrepresentations to some of them prior to the 1969 conveyances to defendant. In their complaint, plaintiffs allege that defendant made the following affirmative misrepresentations to them:

1) That defendant, through its agent Tommy Smith, told some of the Smith heirs that it had hired attorney Alex Boone to represent Tommy Smith and the other Smith heirs in the sale of the Smith property.

2) That defendant, through its officer A.G. Bowman, told some of the Smith heirs that because defendant held a lease on the property that could be in effect for up to fifty years, the property was not worth very much.

The first alleged misrepresentation fails because there is no way to prove whether the statement is false. Both Tommy Smith and Alex Boone are dead; thus, no one can establish whether Tommy Smith actually did hire Boone as his attorney. Thus, summary judgment as to this claim must be granted for defendant.

█ The second alleged misrepresentation fails because of the Dead Man's Statute. Since A.G. Bowman, an officer of defendant, is the only person who allegedly made this statement, plaintiffs are incompetent to testify regarding the statement. In addition, plaintiffs cannot establish justifiable reliance. Tommy Smith was the only name on the lease referred to in the statement; therefore, the other heirs were not bound by the lease and they could not justifiably rely on a statement concerning its effect on the value of their interest.

Hence, summary judgment as to this claim is granted for defendant.

### B. *Fraudulent Concealment*

Plaintiffs allege that defendant committed fraud when it failed to disclose material facts about the Smith property to the plaintiffs when under a duty to do so. This theory is based on O.C.G.A. § 23-2-53, which states that "[s]uppression of a material fact which a party is under an obligation to communicate constitutes fraud." Plaintiffs specifically claim that defendant had a duty to disclose to plaintiffs that the Smith property contained a large deposit of kaolin and that this failure to disclose constitutes fraud.

█ First, plaintiffs have presented enough competent evidence to show that there are material facts in dispute as to the last four elements to be established for a fraud claim. Moreover, defendant has not challenged these four elements in its motion.

█ Defendant's knowledge and intent, elements two and three, are generally questions for the jury except in plain and indisputable cases. *Bill Spreen Toyota, Inc. v. Jenquin,* 294 S.E.2d 533, 163 Ga. App. 855 (1982). Plaintiffs have presented evidence that defendant drilled on the property prior to the conveyances and obtained some information about the presence of kaolin on the property. A jury could find that defendant had knowledge from this evidence.

Moreover, defendant has a policy of not revealing information from drilling surveys to prospective purchasers and has never revealed any such information to the Smith heirs. In addition, A.G. Bowman wrote a letter to defendant's president that stated that he did not believe drilling on the property would affect defendant's chances in obtaining the options since "the property is owned by a large number of negroe [sic] heirs living in widely separated places...." Finally, plaintiffs have presented evidence that the actual market value of the property was worth much more than the purchase price. A jury could infer from this evidence that defendant intended to keep in-

formation about kaolin from the Smith heirs in order to obtain an extremely low price for their interests in the property.

The fourth element, justifiable reliance, is also normally a question for the jury. *Brown v. Techdata Corp.*, 238 Ga. 622, 234 S.E.2d 787 (1977). The discovery of kaolin requires much scientific expertise, and the Smith heirs did not have any such expertise. Moreover, allegedly only Tommy Smith knew that a kaolin company had ever drilled on the property and that such company was the ultimate purchaser in the transaction. Thus, there is sufficient evidence to go to the jury on the question of plaintiffs' justifiable reliance on defendant's failure to disclose its knowledge of the kaolin deposit.

In addition, there is sufficient evidence for the jury to determine whether defendant's failure to disclose information about kaolin to the Smith heirs caused injury. Plaintiffs can establish that they would never have sold the Smith property at the $85,000 price if they had known about the kaolin, and they have submitted evidence to show that the actual market value of the property was much greater than $85,000.

Hence, the only element which the court needs to address is whether defendant had a duty to disclose information about the presence of kaolin on the property to the Smith heirs.

It is the general rule that a purchaser has no duty to disclose to a vendor facts which the purchaser knows affect the value of the property. *See Zaschak v. Traverse Corp.*, 123 Mich.App. 126, 333 N.W.2d 191 (1983) (purchaser had no duty to disclose his knowledge of oil and gas activity on plaintiff's land); *Harrell v. Powell*, 249 N.C. 244, 249, 106 S.E.2d 160 (1958) ("A vendee, who knows that there is a gold mine on the land, is not compelled to disclose that fact to the vendor."); *Grenlac Holding Corp. v. Kahn*, 106 N.Y.S.2d 83 (Sup.Ct.1951) (purchaser had no duty to disclose the true purchaser nor the actual motive for the purchase), *aff'd*, 279 A.D. 989, 112 N.Y.S.2d 494 (1952); *Terrell v. Marion County*, 250 Ala. 235, 240, 34 So.2d 160, 164 (1948) ("Ordinarily, ... a purchaser, though having superior judgment of values, does not commit fraud merely by purchasing without disclosing his knowledge of value."). Thus, the mere fact that defendant alone had knowledge of a large kaolin deposit does not impose a duty on defendant to reveal this information to plaintiffs.

One's duty to disclose "arises from the confidential relations of the parties or from the particular circumstances of the case." O.C.G.A. § 23–2–53. Thus, plaintiffs must establish that a confidential relationship existed between defendant and the Smith heirs or that the circumstances of this case imposed a duty of disclosure on defendant.

### 1. The Confidential Relationship

Under O.C.G.A. § 23–2–58,

Any relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc.

Plaintiffs have raised three possible theories upon which to base a confidential relationship between defendant and the Smith heirs. The first two theories are based on legal relationships: tenancy in common and the attorney/client relationship. The third theory is based on circumstances arising from Tommy Smith's alleged agency to defendant.

#### a. Tenancy in common

Plaintiffs claim that because defendant was a tenant in common with the Smith heirs, defendant had a duty to disclose its knowledge of the quantity of kaolin on the property to the Smith heirs. Under Georgia law, "a tenancy in common is created whenever from any cause two or more persons are entitled to simultaneous pos-

session of any property." O.C.G.A. § 44-6-120.

■ Defendant was a tenant in common with the Smith heirs in two different ways. First, defendant became a tenant in common with the Smith heirs as to the whole property when it purchased Tommy Day's 1/160 interest on April 24, 1969. Plaintiffs claim that defendant's acquisition of this interest in the property created a duty for defendant to disclose information about the kaolin on the property to the other Smith heirs (except Tommy Day).

This argument has no merit. Defendant was in the process of buying the interests of all the Smith heirs; defendant just happened to purchase Tommy Day's interest first. If one adopts plaintiffs' argument, defendant did not owe a duty to Tommy Day but did owe this duty to Viola S. Griffin and W.C. Day, who conveyed their interests to defendant on April 24, 1969 also. Tommy Day was just unlucky in that he happened to convey his interest first.

While this situation does technically create a tenancy in common between defendant and the Smith heirs other than Tommy Day, the court fails to see how a duty to disclose arises. The transaction was set up such that defendant could not purchase all of the interests at one time. From the start, defendant was in the posture of the buyer, and merely because defendant happened to purchase one interest before the others does not impose a duty of disclosure. It would be unreasonable to expect defendant to disclose any information it knew about the property once it had begun purchasing interests.

A better argument arises from the fact that defendant's subsidiary, Georgia Kaolin Company, signed a lease in 1948 for Tommy Smith's mineral rights in the property. Through this lease, defendant was a tenant in common with the Smith heirs other than Tommy Smith as to the mineral rights in the property; all these parties had "simultaneous possession" of the mineral rights.

■ Under Georgia law, tenants in common are in a confidential relationship with each other as to the common estate. *Fuller v. McBurrows*, 229 Ga. 422, 192 S.E.2d 144, 146 (1972) ("[T]enants in common occupy a fiduciary relationship to each other with respect to their interest in common property and the common title under which they hold...."). However, no Georgia case extends this relationship to encompass the circumstance of one tenant purchasing another cotenant's interest.[27]

■ Furthermore, it is the general rule that one cotenant can purchase the interest of another cotenant as if he were buying property from a stranger. 20 Am Jur 2d *Cotenancy and Joint Ownership* § 93. The confidential relationship between cotenants "does not preclude them from contracting with each other in regard to all ordinary matters, including the subject matter of the cotenancy itself." *Id.; see also Kennedy v. Bryant*, 252 So.2d 784 (Miss.1971) ("In transactions of sale of their interests, cotenants do not stand in a relationship of mutual trust and confidence toward each other, but deal as adverse parties."); *Trout v. Harrell*, 217 Ark. 670, 233 S.W.2d 233 (1950); *Ziebarth v. Donaldson*, 150 Minn. 308, 185 N.W. 377 (1921). Thus, defendant, even though it was a cotenant with the other Smith heirs as to the mineral rights in the property, was free to purchase the interests of its fellow cotenants as if it were participating in a typical real estate transaction, in which a purchaser has no duty to disclose. Hence, defendant had no duty to disclose its knowledge of a kaolin deposit to plaintiffs by virtue of its relationship as a tenant in common.[28]

---

**27.** The Georgia cases that discuss the fiduciary relationship between cotenants deal only with the situation in which a cotenant purchases an adverse claim to the common estate and then asserts that claim for his own benefit. *See Thomas v. Hooks*, 231 Ga. 409, 202 S.E.2d 92 (1973); *Fuller v. McBurrows*, 229 Ga. 422, 192 S.E.2d 144 (1972); *Hardin v. Council*, 200 Ga. 822, 38 S.E.2d 549 (1946).

**28.** The court notes that Tommy Smith purchased an interest from his cotenant Evie Barksdale Solomon for $500 when, at the time, defendant had offered $8500 to Tommy Smith for that interest.

#### b. Attorney/client relationship

██ Plaintiffs also claim that Alex Boone was the attorney for the Smith heirs and that, consequently, Alex Boone and the Smith heirs were in a confidential relationship. They argue that this relationship extended to defendant because Alex Boone was defendant's attorney and agent; thus, defendant had a duty to disclose information about the kaolin deposit to the Smith heirs.

This argument fails because, except for the conveyance of Evie Barksdale Solomon's interest to Tommy Smith, there is no competent evidence to establish that Alex Boone was the attorney for Tommy Smith and/or the other Smith heirs during the time of the transactions at issue. The other Smith heirs did not retain Alex Boone themselves. Plaintiffs' Exhibits A1–A15. Moreover, if Tommy Smith did retain Alex Boone as his attorney to represent him during these transactions, there is no written evidence to establish an attorney/client relationship.

The only evidence that supports the theory that Alex Boone was Tommy Smith's attorney during these transactions is that Alex Boone drafted the deed in which Evie Barksdale Solomon conveyed her 1/10 interest in the Smith property to Tommy Smith in 1968. This is not sufficient to establish a confidential relationship between the Smith heirs and defendant on the basis of an attorney/client relationship between Tommy Smith and Alex Boone.

#### c. Tommy Smith's agency to defendant

Plaintiffs' third argument is based on the fact that Tommy Smith was an agent for defendant while he was in a confidential relationship with the other Smith heirs. Plaintiffs claim that this agency put defendant in a confidential relationship with all of the Smith heirs and, consequently, defendant had a duty to disclose to them.

##### i. Defendant's duty to Tommy Smith

Because Tommy Smith dealt directly with defendant and was defendant's agent, his estate's claim of fraudulent concealment against defendant must be treated differently from the claims of the other heirs. The question for the court is whether defendant, as principal, owed Tommy Smith, as agent, a duty of full disclosure.

██ The relationship between principal and agent is confidential and fiduciary, *e.g.*, *Howell v. Greene Real Estate Co.*, 162 Ga.App. 766, 292 S.E.2d 520 (1982); and under this relationship, an agent owes his principal a full duty of disclosure. *E.g.*, *Spratlin, Harrington & Thomas, Inc. v. Hawn*, 116 Ga.App. 175, 156 S.E.2d 402 (1967). A principal, on the other hand, has the obligation to exercise good faith in the relationship and to disclose facts which, if known, would likely cause the agent to suffer pecuniary loss. *Lawrence Warehouse Co. v. Twohig*, 224 F.2d 493 (8th Cir.1955); *Taylor v. Cordis Corp.*, 634 F.Supp. 1242 (S.D.Miss.1986); 3 Am Jur 2d *Agency* § 246. Thus, the principal does not have a duty of full disclosure.

██ This rule would seem particularly to apply to the case at bar where an undisclosed principal is purchasing a property interest from its agent who was hired to help that principal obtain the remaining interests in the property from the agent's other principals. Tommy Smith had no reason to expect that defendant would reveal to him that the Smith property was more valuable than the price offered. Tommy Smith knew that defendant was purchasing the property and wanted to obtain it at the lowest possible price. Therefore, the general rule governing the relationship between buyers and sellers applies. *See supra*. Defendant, as purchaser, had no duty to disclose its knowledge of kaolin deposits in the property to Tommy Smith, its agent.

##### ii. Defendant's duty to the other Smith heirs

██ Although defendant had no duty to disclose its knowledge of kaolin to Tommy Smith, plaintiffs also claim that Tommy Smith's confidential relationship with the other Smith heirs was imputed to defendant through Tommy Smith's agency to defendant.

A jury could easily find that Tommy Smith was in a confidential relationship

with the other Smith heirs. First, he was a cotenant with them, and this cotenancy was established from the same instrument or event, the death of Edward D. Smith.[29] Second, Tommy Smith was a close relative to the other Smith heirs: he was either a brother or "Uncle Tom" to them. Plaintiffs' Exhibits A1–A15.

Third, a jury could find that Tommy Smith was acting as an agent for the other Smith heirs in negotiating and managing the details of the sale. *See supra.* In finding these three factors, a jury could determine that Tommy Smith was in a confidential relationship with the other Smith heirs.

At the same time, a jury could find that there was also an agency relationship between Tommy Smith and defendant. Defendant agreed to compensate Tommy Smith for his aid in getting the options signed by all of the Smith heirs.[30] Plaintiffs claim that Tommy Smith's confidential relationship with the other Smith heirs is imputed to defendant through Tommy Smith's agency.

The Georgia Court of Appeals addressed this question in *Capriulo v. Bankers Life Company*, 178 Ga.App. 635, 344 S.E.2d 430 (1986). In *Capriulo*, an agent of a corporation contacted the plaintiff about possible employment with the corporation. The plaintiff had a chronic illness and was concerned that the corporation's employee insurance policy would not cover the treatments for the illness. However, the corporation's agent assured plaintiff that the insurance would cover plaintiff's treatments. Plaintiff then accepted the employment offer, but later learned that his medical treatments were not covered. Plaintiff sued for fraud against the corporation.

In contrast to the case at bar, the main issue for the Georgia Court of Appeals in *Capriulo* was whether a confidential relationship existed between the plaintiff and the corporation's agent. The court held that it was "a jury issue as to whether a confidential relationship *in fact* ... existed between [the plaintiff] and [the agent]." *Id.* 344 S.E.2d at 434.[31] The court stated that if a jury found a confidential relationship between the agent and the plaintiff, then this relationship was automatically imputed to the corporation:

> Of course, it is elementary that a corporation cannot act but through its agents. In order to further [the corporation's] business, [the agent] desired to capture a particular market. [The agent] initiated talks with a man, [the plaintiff], whom he felt could do the job. It was through [the agent's] special relationship with [the plaintiff] that [the corporation] could achieve the goal of capturing a new market through [the plaintiff's] knowledge and skill. To hold that there could be a special relationship between [the agent] and [the plaintiff] and not between [the plaintiff] and [the corporation] in this circumstance is totally without logic and fairness.

*Id.* at 433. Thus, under *Capriulo*, if a corporation's agent is in a confidential relationship with someone, then that relationship is imputed to the corporation.

This rule must be extended to the case at bar. A jury could find that Tommy Smith was in a confidential relationship with the other Smith heirs and that they trusted and

---

**29.** Some courts have held that a confidential relationship between cotenants *only* arises when the cotenancy was established by the same act or instrument. 20 Am Jur 2d *Cotenancy and Joint Ownership* §§ 70–71.

**30.** Defendant claims that Tommy Smith's alleged agency to defendant was purely ministerial in nature; therefore, his agency to defendant did not conflict with his duty of loyalty to the other Smith heirs. Defendant states that Tommy Smith was only responsible for obtaining the names and addresses of the heirs so that the sale could take place and that Tommy Smith played no role in negotiating the price or terms.

However, the fact that Tommy Smith was allegedly the *only* heir who had any contact with defendant during the transaction defeats this theory. Who else could have participated in the negotiations?

**31.** The court referred to a "confidential relationship in fact" because it is the general rule that a prospective employee and a prospective employer are not in a confidential relationship. However, "[t]he showing of a relationship *in fact* which justifies the reposing of confidence by one party in another is all the law requires." *Capriulo,* at 432.

relied upon his knowledge and judgment in the sale of the Smith property. In addition, Tommy Smith was defendant's agent during the sale. Under *Capriulo*, Tommy Smith's confidential relationship with the other Smith heirs is imputed to defendant.

Hence, while it is true that it is the general rule that the relationship between a potential buyer and seller is not a confidential one, as the court in *Capriulo* stated, "relationships which ordinarily would not be considered to be confidential can, given particular facts, be confidential relationships." *Id.* at 433. Under these facts, a jury could find that defendant, through Tommy Smith's confidential relationship with the other Smith heirs, was "so situated as to exercise a controlling influence over the will, conduct, and interest of [the other Smith heirs]." O.C.G.A. § 23–2–53.

### 2. The Particular Circumstances

In addition to the rule that a duty of disclosure arises from a confidential relationship, under O.C.G.A. § 23–2–53, a duty to disclose may arise "from the particular circumstances of the case." Thus, even if defendant is not in a confidential relationship with the Smith heirs, a jury could find that defendant had a duty to disclose its knowledge of the kaolin deposit on the property to the other Smith heirs.

In *Southern Intermodal Logistics, Inc. v. Smith & Kelly Company*, 190 Ga. App. 584, 379 S.E.2d 612 (1989), the Georgia Court of Appeals stated, "While concealment of material facts may amount to fraud when the concealment is of intrinsic qualities the other party could not discover by the exercise of ordinary care, in an armslength business or contractual relationship there is no obligation to disclose information which is equally available to both parties." *Id.* 379 S.E.2d at 614; *see also Reeves v. B.T. Williams & Company*, 160 Ga. 15, 127 S.E. 293 (1925) (whether the particular circumstances create a duty of disclosure was for the determination of the jury).

In this case, a jury could find that the Smith heirs, other than Tommy Smith, were not in an armslength contractual rela-

tionship with defendant. They did not know that defendant was paying Tommy Smith to get them to sign the options. Furthermore, they did not know that Alex Boone, the named purchaser on the 1968 options, was acting as the agent for defendant. They also did not know that defendant had drilled on the Smith property or even that defendant was the ultimate purchaser. Finally, they thought that Alex Boone was representing Tommy Smith in the transaction. Thus, a jury could find that they were not dealing at armslength with defendant, and that consequently, defendant had a duty to disclose an intrinsic quality of the property not easily discoverable.

In contrast to the other Smith heirs, Tommy Smith knew with whom he was dealing during the entire transaction. He knew that defendant had conducted drilling on the property in 1949 because defendant had drilled under the lease that Tommy Smith had granted to it. He also was living on the property during the 1949 and 1968 drilling conducted by defendant. Moreover, there is no competent evidence to establish what Tommy Smith's relationship to Alex Boone really was during the transaction. Thus, a jury could not find that Tommy Smith and defendant were not dealing at armslength.

The particular circumstances did not create a duty of disclosure from defendant to Tommy Smith. Hence, as to the claim of fraudulent concealment by the estate of Tommy Smith, plaintiffs have failed to establish the first element, that defendant had a duty to disclose, and summary judgment for defendant on the claim of Dorothy Cooper, as representative of Tommy Smith's estate, must be granted.

### II. THE STATUTE OF LIMITATIONS

■ Defendant also alleges that because the conveyances took place in 1969 and in 1971, plaintiffs' fraud claims are barred by the statute of limitations. A seven-year period of limitations applies to an action seeking cancellation of a deed allegedly obtained by fraud. *Knight v. Department of Transportation*, 239 Ga.

368, 236 S.E.2d 826 (1977). A four-year period of limitations applies to actions seeking damages for fraud. O.C.G.A. § 9–3–31. Thus, plaintiffs' cause of action is barred unless they can show that the statute was tolled during the period between the time the conveyances were made and the time this lawsuit was filed.

The plaintiffs rely on O.C.G.A. § 9–3–96:

If the defendant or those under whom he claims are guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the plaintiff's discovery of the fraud.

In *Shipman v. Horizon Corporation*, 245 Ga. 808, 267 S.E.2d 244, 246 (1980), the Supreme Court of Georgia held that where *actual fraud* is the gravamen of the action,

[T]he statute of limitations is tolled until the fraud is discovered or by reasonable diligence should have been discovered. No other independent fraudulent act is required to toll the statute. Silence is treated as a continuation of the original act of fraud.

Actual fraud "consists of any artifice by which another is deceived." O.C.G.A. § 23–2–51. "Whether a fraud is actual depends on whether the false representation was made with the purpose and intent to deceive." *Gaultney v. Windham*, 99 Ga. App. 800, 109 S.E.2d 914 (1959). One of plaintiffs' primary contentions is that defendant *intentionally* failed to disclose certain facts about the sale of the property to induce plaintiffs to sell at a very low price, and the court has already found that plaintiffs have met their burden to present a prima facie case of actual fraud. Therefore, plaintiffs do not need to show that defendant has committed a later, separate fraudulent act to conceal defendant's original fraud in order to toll the statute.

■ Defendants claim that the statute was not tolled because plaintiffs failed to exercise diligence in attempting to discover the alleged fraud. A plaintiff has a duty to exercise diligence to discover the fraud in order to toll the statute; mere ignorance of

the fraud is not sufficient. *Morris v. Johnstone*, 172 Ga. 598, 158 S.E. 308 (1931).

■ Defendant claims that plaintiffs were put on notice to investigate their sale of the property to defendant because Tommy Smith continued to live on the property following the conveyances, open kaolin mines were in operation at the time of these conveyances, and operations at these mines increased after 1971. Defendant claims that plaintiffs' failure to investigate shows that they failed to exercise ordinary diligence in attempting to discover the alleged fraud.

However, the question of whether a party exercised due diligence in discovering the alleged fraud is normally a question for the jury. *Brown v. Brown*, 209 Ga. 620, 75 S.E.2d 13 (1953). Moreover, failure to exercise reasonable diligence may be excused if a relationship of trust and confidence existed between the parties. *Shipman v. Horizon Corp.*, 245 Ga. 808, 267 S.E.2d 244 (1980); *Lowe v. Presley*, 86 Ga.App. 328, 71 S.E.2d 730 (1952). Plaintiffs have presented evidence such that a jury could determine that defendant was in a confidential relationship with the Smith heirs. Therefore, summary judgment against plaintiffs based on the statute of limitations must be denied.

## CONCLUSION

The court finds that plaintiffs, other than the estate of Tommy Smith, have presented a prima facie case of intentional fraudulent concealment against defendant and that their claims are not barred by the statute of limitations. However, plaintiffs have failed to overcome defendant's motion for summary judgment on all other claims.

Therefore, the court GRANTS defendant's motion for summary judgment on all claims against the estate of Tommy Smith and DENIES defendant's motion for summary judgment on all fraudulent concealment claims presented by all other plaintiffs except Grant Smith. (As the court previously stated, this order has no effect on Grant Smith's fraud claim as his claim will be addressed in a separate order.) The

court GRANTS defendant's motion for summary judgment on all other claims.

SO ORDERED.